**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

|  |  |
|---|---|
| INGENIOSHARE, LLC, | |
| Plaintiff, | Civil Action No. 25-cv-385 |
| v. | |
| EPIC GAMES, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

IngenioShare, LLC states for its Complaint against Epic Games, Inc. as follows:

**INTRODUCTION**

1.       This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

**THE PARTIES**

2.       IngenioShare, LLC ("IngenioShare") is a limited liability company organized and existing under laws of California.

3.       Defendant Epic Games, Inc. ("Defendant" or "Epic") is a corporation duly organized and existing under the laws of the state of Maryland.  Epic is registered to do business in North Carolina and has its principal place of business in Wake County, North Carolina at 620 Crossroads Boulevard, Cary, North Carolina 27518.

1

## JURISDICTION & VENUE

4.       This Court has subject matter jurisdiction over all causes of action set forth herein pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271, *et seq*.

5.       This Court has personal jurisdiction over Epic because Epic has a principal place of business in the State of North Carolina and in this Judicial District and Division.  Epic therefore has minimum contacts with the State of North Carolina and has purposefully availed itself of the privileges of conducting business in the State of North Carolina.  *See* https://www.epicgames.com/site/en-US/about.

6.       On information and belief, Epic has committed and continues to commit acts of infringement in the State of North Carolina and in this Judicial District and Division, and the claims addressed in this Complaint arise out of and relate to such acts, including at least by making, using, offering for sale, and selling the infringing technology, products, systems, methods, and/or computer software within this District and Division.

7.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) because (i) Epic has a regular and established place of business in this Judicial District and Division and (ii) Epic is registered with, and authorized to transact business in, the State of North Carolina. Epic's registered agent in the State of North Carolina is CT Corporation System, 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615. *See* https://www.sosnc.gov/online_services/search/Business_Registration_profile/6190029.

2

## INGENIOSHARE'S INVENTIVE AND PATENTED TECHNOLOGY

8.     Generally speaking, IngenioShare's patented technology comprises different embodiments of a computer-implemented system and method to manage the communication of a user.  In one embodiment, an apparatus, using at least a network-based portal based on an Internet protocol provides a number of communication options to a first user, with messages eligible to be received via an electronic device associated with a second user based on any of the options depending on an identifier associated with the second user, the options including text messaging and voice communication; could receive an indication from the first user via an electronic device associated with the first user, indicating the selection of a communication option for a message for the second user; could permit the second user to block the first user from accessing the second user; and could determine availability of the second user to receive the message.  The apparatus could require contact information associated with the second user to allow the second user to receive messages via the network-based portal, with the contact information associated with the second user not provided to the first user via the electronic device associated with the first user, even when the message is received by the second user via the electronic device associated with the second user, and with the contact information associated with the second user being distinct from the identifier associated with the second user.

### A.     The Prior Art and Its Deficiencies

9.     As described in the specification(s) of the patents-in-suit, individual users often utilize multiple communication modes, including desk phones, fax machines, mobile phones, email, and instant messaging, and may possess several phone numbers and email addresses. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 1, lines 50–55.  As discussed in the specification(s)

3

of the patents-in-suit, a persistent need existed to effectively manage these numerous communication channels. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 1, lines 56–61.

10. The technical challenge of managing an individual's electronic communications arose in the 1990's, as advancements in Internet and cellular network technologies enabled users to access multiple new communication devices, such as computers and mobile phones, in addition to conventional landline phones and fax machines.

11. At that time, landline telephone networks, the Internet, and cellular networks operated as separate, non-integrated technologies. Traditional phone calls and fax transmissions were conducted over the landline network; mobile calls and SMS messages were transmitted via cellular networks; and email and other text-based communications were sent over the Internet. Even within a single network technology, different modes of communication relied on distinct protocols. For example, mobile calls and SMS messages utilized separate protocols within cellular networks, just as email and text messaging employed different protocols over the Internet.

12. As described in the specification(s) of the patents-in-suit, individual users typically maintained separate contact information (e.g., number or address) for each mode of communication. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 3, lines 63–66. This fragmented structure created significant challenges in managing communications. From the sender's perspective, initiating communication required knowledge of the recipient's specific contact information for the desired communication mode (e.g., landline number or email address). As these identifiers were unique to each channel, the sender was required to obtain, manage, and utilize multiple contact points to reach the recipient through various communication

4

methods.

13. From the recipient's standpoint, the need to disclose separate contact information for each mode of communication diminished both privacy and confidentiality. For example, answering a call to a landline at a home or office inherently discloses the recipient's location. Additionally, recipients lacked the ability to consistently enforce their communication preferences – such as determining who may contact them, when, and under what circumstances – across different communication modes. For instance, preventing a specific individual from communicating using one channel, such as a landline telephone, did not preclude that individual from communicating with the recipient through a different channel, such as email or text messaging.

14. Accordingly, prior to IngenioShare's invention(s), there existed an unmet need for a system and method to efficiently manage multiple communication modes while uniformly applying a user's privacy, accessibility, and confidentiality preferences across those modes.

### B. IngenioShare's Patented Technology Solves Prior Art Problems

15. The systems and methods developed, disclosed, and claimed in IngenioShare's patents address numerous deficiencies and limitations inherent in the prior art. IngenioShare's patents teach an integrated solution that uniformly manages multiple communication modes and channels in accordance with user-defined privacy, accessibility, and confidentiality preferences. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 3, lines 43–58.

16. One or more claimed embodiments of IngenioShare's invention(s) provide for a network-based portal enabling users to conduct communications across multiple modes. Each user is associated with a unique access identifier or digital identity which the portal employs to

5

manage all communication modes consistent with the user's specified preferences. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 13-23 and Column 5, lines 33-36.

17.     One or more claimed embodiments of IngenioShare's invention(s) leverages the convergence of multiple communication modalities onto the Internet Protocol. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 11–13.  This convergence became possible in the late 1990's with the development of protocols such as the Session Initiation Protocol (SIP), as defined in RFC 2543 (March 1999), which facilitates the establishment and management of real-time communications – such as voice, video, and messaging – over the Internet.  Nonetheless, full convergence occurred gradually over several years.  For example, the original iPhone, released in 2007, utilized SMS for text messaging and traditional cellular networks for voice calls, thereby requiring an Internet connection only for email functionality; video calls were not yet supported.  It was not until the introduction of iMessage in 2011 that the iPhone facilitated voice calls, email, text messaging, and video communications over Internet Protocol.

18.     By contrast, under the prior art, although users may have possessed multiple devices capable of supporting various communication modes (e.g., desktop telephone, fax machine, cellular phone, desktop computer), with the exception of desktop computers, such devices were generally not connected to the Internet and their communications did not and could not route through an Internet-based portal.  While some cellular phones available prior to 2005 offered limited Internet access, it was primarily for email and web browsing; voice calls and text messaging continued to rely predominantly on the cellular network rather than the Internet Protocol.

19.     One or more claimed embodiments of IngenioShare's invention(s) enables a

sender to initiate communication with a recipient across any communication channel using the recipient's digital identity, rather than requiring the sender to obtain and manage separate contact information for each mode. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 15–23. The sender accesses a network-based portal and selects the desired mode of communication. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 2, lines 7–10. The portal then identifies both the sender and the recipient and facilitates the communication via the selected mode – without disclosing the recipient's contact information to the sender, or vice versa. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 5, lines 42–48. This innovation streamlines the process of managing multiple contact points for a recipient. For example, a sender may continue to place a cellular call to a recipient using the recipient's digital identity, even if the recipient's mobile phone number has changed.

20.     One or more claimed embodiments of IngenioShare's invention(s) enhances privacy by enabling users to consistently enforce their communication preferences – such as specifying who may contact them, at what times, and under what circumstances – across all communication channels. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 25–26. The user configures an access priority database within the portal, which governs the handling of incoming communications based on the user's status, the sender's priority level, and the urgency of the message. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 25–38 and lines 53–62, Column 6, lines 6–12, and Figs. 2–5. Unlike the prior art, IngenioShare's claimed portal may apply the user's preferences uniformly to all incoming communications, regardless of the channel over which they are received.

21.     Additionally, by assigning users a digital identity separate from their contact

information, one or more claimed embodiments of IngenioShare's invention(s) ensures a high level of confidentiality and privacy. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 2, lines 20–23. The portal facilitates the establishment and maintenance of communication using only the digital identities of the sender and recipient, without disclosing their contact details, location, status, or other personal attributes. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 5, lines 22–52. In contrast to the prior art, IngenioShare's claimed and inventive approach allows users to identify the other communicating party without revealing any contact or personal information.

### IngenioShare's U.S. Patent No. 10,142,810

22.     On November 27, 2018, the United States Patent and Trademark Office duly and legally issued United States Patent No. 10,142,810 ("the '810 patent"), entitled "Method and Apparatus to Manage Different Options of Communications Using One User Identifier Based on Internet Protocol." A true and correct copy of the '810 patent is attached hereto as Exhibit A.

23.     IngenioShare is the owner, by assignment, of all right, title, and interest in and to the '810 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

24.     The claims of the '810 patent are focused on the above-described advances over the prior art and the advances over the prior art also described in the '810 patent, such that their character as a whole is not directed to excluded subject matter, including an abstract idea, and any other subject matter excluded under 35 U.S.C. §101.

25.     Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101. These representative claim terms also were not previously performed, and could not be performed, by a

8

human. These representative claim terms also align with how IngenioShare's invention(s) solves the prior art problems discussed above and also in the '810 patent.

- "managing electronic communications using at least a network-based portal";

- "a plurality of communication options";

- "a prior registration process";

- "all of the communication options use one identifier associated with the second user";

- "permitting the second user to block the first user from reaching the second user via the network-based portal";

- "enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user";

- "determining availability of the second user";

- "wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user";

- and "the one identifier associated with the second user is distinct from the contact information".

26.     The above-listed representative claim terms, standing alone and in combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the '810 patent.

27.     The Patent Office determined all the claims of the '810 patent to be patent eligible, definite, novel and nonobvious.

28.     The '810 patent solves real-world, technological problems.

29.     The solutions disclosed and claimed in the '810 patent are utilized in computing apparatuses, including as detailed in the claim chart attached as Exhibit B.

30.     The claims of the '810 patent recite features that address the technical problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art.

31.     The inventions claimed in the '810 patent were not well-understood, routine, or conventional as of the priority date of the '810 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

32.     The '810 patent is compliant with 35 U.S.C. § 101.

33.     The '810 patent is compliant with 35 U.S.C. § 102.

34.     The '810 patent is compliant with 35 U.S.C. § 103.

35.     The '810 patent is compliant with 35 U.S.C. § 112.

36.     The '810 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282.

### IngenioShare's U.S. Patent No. 10,492,038

37.     On November 26, 2019, the United States Patent and Trademark Office duly and

10

legally issued United States Patent No. 10,492,038 ("the '038 patent"), entitled "Method and Apparatus to Manage Messaging Providing Different Communication Modes Depending on One Identifier and Not Requiring to Disclose Contact Information." A true and correct copy of the '038 patent is attached hereto as Exhibit C.

38.     IngenioShare is the owner, by assignment, of all right, title, and interest in and to the '038 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

39.     The claims of the '038 patent are focused on an advance over the prior art such that their character as a whole is not directed to excluded subject matter, such as an abstract idea, or any other subject matter excluded under 35 U.S.C. §101.

40.     Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101.  These representative claim terms also were not previously performed, and could not be performed, by a human.  These representative claim terms also align with how IngenioShare's invention(s) solves the prior art problems discussed above and also in the '038 patent.

- "computer readable medium including at least executable computer program code stored therein that facilitates electronic communication of a plurality of users using at least a network-based portal at least based on Internet protocol";

- "a plurality of modes of communication available for the plurality of users to communicate, with each of the plurality of users having an identifier for use with the plurality of modes of communication;"

- "without requiring the plurality of users to disclose their contact information to

11

each other;"

- "the computer readable medium comprising: computer program code for providing a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent from the first user to a second user, based on an identifier associated with the first user previously set by the first user via the network-based portal";

- "wherein the plurality of modes of communication supported by the network-based portal include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone voice communication using a mobile phone, and communication with at least an image";

- "wherein messages are eligible to be received electronically by the second user via the network-based portal, based on any of the plurality of modes of communication, all depending on an identifier associated with the second user previously set by the second user via the network-based portal, which allows the second user to efficiently maintain the second user's communication using the plurality of modes of communication";

- "computer program code for permitting the second user to block the first user from using at least the selected mode of communication to communicate with the second user via the network-based portal, based on the identifier associated with the first user";

12

- "computer program code for enabling the first message to be electronically provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal";

- "computer program code for determining availability of the second user related to receiving messages"; and

- "computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal, wherein even when the first message is received by the second user via the selected mode of communication, the contact information associated with the second user is not provided via the network-based portal to the first user, and contact information associated with the first user is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user;"

- and "wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user."

13

41. The above-listed representative claim terms, standing alone and in combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the '038 patent.

42. The Patent Office determined all the claims of the '038 patent to be patent eligible, definite, novel and nonobvious.

43. The '038 patent solves real-world, technological problems.

44. The solutions disclosed and claimed in the '038 patent are utilized in popular video games, including as detailed in the claim chart attached as Exhibit D.

45. The claims of the '038 patent recite features that address the technical problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art. Thus, the claims are not directed to an abstract concept.

46. The inventions claimed in the '038 patent were not well-understood, routine, or conventional as of the priority date of the '038 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

47. The '038 patent is compliant with 35 U.S.C. § 101.

48. The '038 patent is compliant with 35 U.S.C. § 102.

49. The '038 patent is compliant with 35 U.S.C. § 103.

50. The '038 patent is compliant with 35 U.S.C. § 112.

51. The '038 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282.

### IngenioShare's U.S. Patent No. 10,708,727

52. On July 7, 2020, the United States Patent and Trademark Office duly and legally

14

issued United States Patent No. 10,708,727 ("the '727 patent"), entitled "Method and Apparatus to Manage Messaging Providing Different Communication Modes Using One Identifier and Not Requiring to Disclose Contact Information." A true and correct copy of the '727 patent is attached hereto as Exhibit E.

53.     IngenioShare is the owner, by assignment, of all right, title, and interest in and to the '727 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

54.     The claims of the '727 patent are focused on advances over the prior art such that their character as a whole is not directed to excluded subject matter, such as an abstract idea, or any other subject matter excluded under 35 U.S.C. §101.

55.     Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101. These representative claim terms also were not previously performed, and could not be performed, by a human. These representative claim terms also align with how IngenioShare's invention(s) solves the prior art problems discussed above and also in the '727 patent.

- "providing a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent from the first user to a second user, based on an identifier associated with the first user previously set by the first user via the network-based portal",

- "wherein the plurality of modes of communication supported by the network-based portal include at least text communication using a personal computer, voice

15

communication using a personal computer, and communication with at least an image", and

- "wherein messages are eligible to be received by the second user via the network-based portal, based on any of the plurality of modes of communication, all depending on an identifier associated with the second user previously set by the second user via the network-based portal, which allows the second user to efficiently maintain the second user's communication using the plurality of modes of communication";

- "enabling the second user to block the first user from using at least the selected mode of communication to communicate with the second user via the network-based portal, based on the identifier associated with the first user";

- "enabling the first message to be provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal"; and

- "receiving a second message from the second user to the first user, to respond to the first message, after the second user has received the first message",

- "wherein one of the first message or the second message is voice and the other of the first message or the second message is text",

- "wherein even when the first message is received by the second user via the selected mode of communication, contact information associated with the second

user and provided by the second user to the network-based portal is not provided via the network-based portal to the first user, and contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user",

- "wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user",

- "wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user", and

- "wherein the contact information associated with the first user includes at least one of a phone number or an email address of the first user."

56.   The above-listed representative claim terms, standing alone and in combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the '727 patent.

57.   The Patent Office determined all the claims of the '727 patent to be patent eligible, definite, novel and nonobvious.

58.   The inventions claimed in the '727 patent solve real-world, technological problems.

17

59. The solutions disclosed and claimed in the '727 patent are utilized in computing apparatuses, including those detailed in the claim charts attached as Exhibit F.

60. The claims of the '727 patent recite features that address the technical problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art. Thus, the claims are not directed to an abstract concept.

61. The inventions claimed in the '727 patent were not well-understood, routine, or conventional as of the priority date of the '727 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

62. The '727 patent is compliant with 35 U.S.C. § 101.

63. The '727 patent is compliant with 35 U.S.C. § 102.

64. The '727 patent is compliant with 35 U.S.C. § 103.

65. The '727 patent is compliant with 35 U.S.C. § 112.

66. The '727 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282.

67. IngenioShare's '810, '038, and '727 patents are collectively referred to herein as the "patents-in-suit."

## EPIC'S INFRINGING SYSTEMS AND METHODS

68. Epic is a video game developer and publisher.

69. One of Epic's video games is *Fortnite*, a vibrant ecosystem full of a variety of social entertainment experiences, with over 500 million registered players.

70. *Fortnite* is a multiplayer online experience where people interact in an online world. *Fortnite* also includes thousands of creator-made games across genres, such as adventure,

18

roleplay, survival, and more.

71. Defendant Epic released *Fortnite* on July 25, 2017.

72. *Fortnite* is free to download; however, *Fortnite* sells in-game items such as outfits for characters. In *Fortnite*, players can purchase in-game cosmetic items as well as a *Fortnite* "Battle Pass," through which players can unlock cosmetics as they "level up" their accounts by playing games, completing quests and challenges, and more. Players can also earn cosmetic items without purchasing them either by participating in free events, spending virtual currency earned by progressing the Battle Pass, or by winning certain tournaments through skill and mastery of the game's mechanics. Cosmetic items have a variety of effects, from changing the appearance of the player's character to allowing the character to do a specific dance, among other things.

73. Normally, Fortnite is played by multiple players concurrently. On information and belief, Fortnite has at least three distinct game mode versions that have the same general gameplay and game engine: Fortnite: Save the World, which is a cooperative hybrid-tower, defense-shooter-survival game in which four players fight off zombie-like creatures and defend objects with traps and fortifications they might build; Fortnite Battle Royale, a battle royale game in which up to 100 players fight to be the last person standing; and Fortnite Creative, in which players are given complete freedom to create worlds and battle arenas.

74. *Fortnite*'s "Battle Royale" game mode was released to the public on September 26, 2017. *Fortnite*'s Battle Royale involves dropping a maximum of 100 players into a large map where the players battle each other until only one player (or team) remains standing. *Fortnite*'s Battle Royale game mode can include *Fortnite*'s unique "building" mechanic in which players

19

can construct and take advantage of structures, ramps, and cover to defeat other players and characters in intense combat. *Fortnite*'s "Zero Build" Battle Royale game mode removes this build mechanic, emphasizing the players' precision, thinking, and spatial awareness skills.

75.     In *Fortnite*'s Battle Royale, a player's success is often determined by their skill level, which can be practiced and honed through gameplay. For example, a player's success in combat is often determined by their ability to use their controller, or mouse and keyboard, to precisely maneuver their character, maintain awareness of their virtual surroundings, place and edit structures in an advantageous manner, and to aim at their target quickly and accurately.

76.     Various versions of Defendant Epic's *Fortnite* computer code and audiovisual works are the subjects of U.S. Copyright Registrations, including:

| Title | Registration No. | Registration Date | Nature of Work |
|---|---|---|---|
| *Fortnite* | TX 8-766-571 | Jan. 31, 2019 | Revised computer program |
| *Fortnite* | TX 8-507-210 | Mar. 21, 2018 | Revised computer program |
| *Fortnite* | PA 2-066-544 | Sept. 13, 2017 | Revised computer program; audiovisual material |
| *Fortnite* | TX 8-186-254 | July 14, 2015 | Computer program |
| *Fortnite* | TX 8-254-659 | Mar. 3, 2016 | Computer program |
| *Fortnite* | TXu 1-895-864 | Dec. 18, 2013 | Computer program |
| *FORTNITE* (2016 Rev. 2) | TX 8-352-178 | Dec. 23, 2016 | Computer program |
| *Fortnite* – Battle Royale Mode | PA 2-087-919 | Mar. 23, 2018 | Revised and new audiovisual material |
| *Fortnite* Battle Royale Chapter 5 Season 1 | TX 9-420-173 | July 3, 2024 | Computer program; audiovisual material |
| Fortnite Chapter 4: Season OG | TX 9-388-536 | Apr. 25, 2024 | Computer program; audiovisual |
| *Fortnite* Reload | TX 9-437-406 | Sept. 17, 2024 | Computer program; |

20

| | | | audiovisual material |
|---|---|---|---|
| *Fortnite* (Rev. 3) | TX 8-508-464 | Sept. 8, 2017 | Computer program; audiovisual material |

77.     Fortnite allows players to communicate with one another. Such communication features are crucial to Fortnite. As explained by Epic's CEO Tim Sweeney, part of the appeal of Fortnite is that it is "as much a social hangout for a lot of folks as it is a game." https://www.wsj.com/articles/the-man-behind-fortnite-11560571201?mod=hp_lead_pos5.

78.     In order to download, play, or otherwise access Defendant Epic's *Fortnite*, a user must agree to the *Fortnite* End User License Agreement.

79.     Defendant's players must agree to the *Fortnite* End User License Agreement before downloading, playing, or otherwise accessing *Fortnite*.

80.     By agreeing to Defendant Epic's *Fortnite* End User License Agreement, that user enters into a valid and enforceable contract with Defendant Epic.

81.     On information and belief, in addition to Fortnite, Epic also provides additional and similar video games on similar terms, including but not limited to Rocket League.

## THE PARTIES' COMMUNICATIONS PRIOR TO THE TEXAS LAWSUIT

82.     Beginning in November 2018, IngenioShare's predecessor-in-interest approached Epic in writing to discuss a business agreement regarding IngenioShare's patents applicable to Epic's video games.  Epic did not respond.

83.     IngenioShare's predecessor-in-interest also provided notice to Epic of the '810 patent in a letter dated November 29, 2018, and offered to reach a business agreement with Epic. IngenioShare's predecessor-in-interest again provided Epic with notice of the '810 patent by letter dated October 11, 2019 (along with related patents) and offered to reach a business

21

agreement with Epic regarding its patent rights.  Epic did not respond to either letter.

84.     Subsequently in an October 2019 letter to Epic, IngenioShare's predecessor-in-interest again sought a business discussion concerning IngenioShare's patents explaining some of the benefits of the patented technologies in video game online communications.  The letter included a press release, which expressly noted "*Fortnite* [has] implemented [IngenioShare's predecessor-in-interest's] patented technologies." (https://www.businesswire.com/news/home/20191003005319/en/).  Epic chose not to respond to the letter.

85.     IngenioShare's predecessor-in-interest provided notice to Epic of the allowed application that matured into the '038 patent in a letter dated October 11, 2019 (along with related patents) and offered to reach a business agreement with Epic regarding IngenioShare's patent rights.  Epic did not respond.

86.     IngenioShare's predecessor-in-interest provided notice to Epic of how the '038 patent could be infringed in a letter dated January 7, 2020, and again offered to reach a business resolution.  Epic again did not respond.

87.     In January 2020, IngenioShare's predecessor-in-interest again contacted Epic in writing requesting a dialog to discuss its intellectual property rights, even illustrating how one of IngenioShare's patents could be infringed.  Epic again did not respond.  Despite these good-faith efforts to negotiate a business solution, Epic failed to show any desire for a resolution and continues to use IngenioShare's intellectual property without authority.

88.     In June 2021, IngenioShare, by way of counsel, communicated in writing with Epic alerting Epic of Epic's infringement of IngenioShare's patents and offering to seek

22

resolution.

## THE TEXAS LAWSUIT

89.     On June 25, 2021 IngenioShare filed suit against Epic in the Western District of Texas (the "Texas Lawsuit").  The lawsuit was assigned case number 6:21-cv-00663.

90.     The Texas lawsuit also provided Epic with notice of Epic's infringement of IngenioShare's '810 patent, IngenioShare's '038 patent, and IngenioShare's '727 patent no later than June 25, 2021.

91.     On March 18, 2022 the Texas lawsuit was dismissed for improper venue.

## THE PATENT OFFICE'S INTER PARTE REVIEWS ("IPRs") OF THE THREE PATENTS-IN-SUIT

92.     On November 15, 2021 Epic filed a Petition For Inter Partes Review of the '810 patent.

93.     On May 23, 2022 the Patent Office instituted an IPR of the '810 patent, IPR2022-00202.

94.     On May 19, 2023 the Patent Office entered a Final Written Decision in IPR2022-00202 finding the claims of the '810 patent are not unpatentable.

95.     On December 7, 2022 Epic filed two Petitions For Inter Partes Review of the '038 patent.

96.     On June 7, 2022 the Patent Office instituted two IPRs of the '038 patent, IPR2022-00294 and IPR2022-00295.

97.     On May 19, 2023 the Patent Office entered a Final Written Decision in IPR2022-00294 and IPR2022-00295 finding the claims of the '038 patent are not unpatentable

23

98.     On December 7, 2022 Epic filed a Petition For Inter Partes Review of the '727 patent.

99.     On May 24, 2022 the Patent Office instituted an IPR of the '727 patent, IPR2022-00291.

100.    On May 19, 2023 the Patent Office entered a Final Written Decision in IPR2022-00291 finding the claims of the '727 patent are not unpatentable.

## THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT AFFIRMED THE PATENT OFFICE'S FINAL WRITTEN DECISIONS

101.    On April 24, 2025 the Court of Appeals for the Federal Circuit affirmed the Patent Office's Final Written Decisions in IPR2022-00202 regarding the '810 patent, IPR2022-00291 regarding the '727 patent, and IPR2022-00294 and IPR2022-00295 regarding the '038 patent.

## EPIC IS ESTOPPED FROM CONTESTING THE VALIDITY OF THE '810 PATENT, THE '038 PATENT, AND THE '727 PATENT PURSUANT TO 35 U.S.C. § 315

102.    By virtue of the Patent Office's Final Written Decisions confirming the validity of the '810 patent, the validity of the '038 patent, and the validity of the '727 patent, which were affirmed by the Court of Appeals for the Federal Circuit, Epic is estopped from contesting the validity the '810 patent, the validity of the '038 patent, and the validity of the '727 patent, on any ground that Epic raised or reasonably could have raised during that IPRs, pursuant to 35 U.S.C. § 315 (e)(2).

103.    The scope of estoppel includes, but is not necessarily limited to, the prior art and arguments submitted by Epic in the IPRs.

104.    The scope of estoppel also includes, but is not necessarily limited to, the prior art

24

referenced in the Invalidity Contentions Epic submitted in the Texas lawsuit (attached hereto as Exhibit G).

## COUNT ONE: DIRECT INFRINGEMENT OF INGENIOSHARE'S '810 PATENT

105.    IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

106.    Epic has infringed one or more claims of the '810 Patent, including at least claims 1 and 11, in violation of 35 U.S.C. §§ 271(a) by making, using, offering to sell, or selling the patented invention within the United States or importing the patented invention into the United States.

107.    A representative example of Epic's infringing apparatuses, methods, and systems includes (but is not limited to) Epic's video games known as Fortnite and Rocket League.  A representative claim chart demonstrating Epic's infringement of the '810 Patent, either literally or under the doctrine of equivalents, is attached as Exhibit B.  Epic's infringing apparatuses, methods, and systems include, without limitation, other video games providing functionality such as that shown in the representative charts ("Epic's Accused Products").

108.    IngenioShare notified Epic of its infringement of the '810 Patent prior to filing suit and no later than October 11, 2019.

109.    Further notice of IngenioShare's '810 Patent and Epic's infringement thereof was also provided to Epic in the Texas Lawsuit.

110.    IngenioShare has suffered damages as a direct and proximate result of Epic's direct infringement of the '810 Patent.

111.    On information and belief, Epic made over five billion dollars in 2018 from

25

Fortnite alone, over three billion dollars in 2019 from Fortnite alone, over five billion dollars in

2020 from Fortnite alone, over four billion dollars in 2021 from Fortnite alone, over four billion

dollars in 2022 from Fortnite alone, over five billion dollars in 2023 from Fortnite alone, over

five billion dollars in 2024 from Fortnite alone, and Epic is projected make over six billion

dollars in 2025 from Fortnite alone.

112.    IngenioShare is entitled to: (i) damages adequate to compensate it for Epic's

direct infringement of the '810 Patent, which amounts to, at a minimum, a reasonable royalty; (ii)

attorneys' fees; (iii) costs; and (iv) treble damages due to willful infringement.

## COUNT TWO: INDIRECT INFRINGEMENT OF INGENIOSHARE'S '810 PATENT

113.    IngenioShare realleges and incorporates herein the preceding allegations of this

Complaint as if fully set forth herein.

114.    Epic has known of IngenioShare's '810 Patent since no later than November 29,

2018.

115.    IngenioShare notified Epic of its infringement of the '810 Patent no later than

October 11, 2019.

116.    Further notice of IngenioShare's '810 Patent and Epic's infringement thereof was

also provided to Epic in the Texas Lawsuit.

117.    Epic has known that its systems infringe one or more claims of IngenioShare's

'810 Patent since no later than November 29, 2018.

118.    Epic's customers directly infringe at least representative claims 1 and 11 of

IngenioShare's '810 Patent by playing and using Epic's video games, including but not

26

necessarily limited to Epic's Accused Products, in a manner that infringes the asserted claims of the patents-in-suit.

119.    Epic's customers include people who play video games, including adults, teenagers, and children.

120.    In order to download, play, or otherwise access Defendant Epic's *Fortnite*, a user must agree to the *Fortnite* End User License Agreement.

121.    Defendant's players must agree to the *Fortnite* End User License Agreement before downloading, playing, or otherwise accessing *Fortnite*.

122.    By agreeing to Defendant Epic's *Fortnite* End User License Agreement, that user enters into a valid and enforceable contract with Defendant Epic.

123.    Epic has in the past and continues to indirectly infringe at least representative claims 1 and 11 of IngenioShare's '810 Patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including customers and end users, by encouraging and instructing their customers to use and play Epic's Accused Products in a manner understood and intended to infringe IngenioShare's '810 Patent.  For example, despite knowing of IngenioShare's '810 Patent, and its infringement thereof; as shown above, Epic requires and/or instructs its customers to utilize its video games, such as Fortnite, in a manner understood and intended to infringe IngenioShare's '810 Patent.

124.    Epic indirectly infringed at least claims 1 and 11 of the '810 Patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including retailers, customers and/or end users, by distributing, offering for sale and/or selling Epic's Accused Products in the United States and instructing on their infringing

27

use without authority or license from IngenioShare and in a manner understood and intended to infringe the '810 Patent.

125.    IngenioShare has suffered damages as a direct and proximate result of Epic inducing infringement of IngenioShare's '810 Patent.

126.    On information and belief, Epic made over five billion dollars in 2018 from Fortnite alone, over three billion dollars in 2019 from Fortnite alone, over five billion dollars in 2020 from Fortnite alone, over four billion dollars in 2021 from Fortnite alone, over four billion dollars in 2022 from Fortnite alone, over five billion dollars in 2023 from Fortnite alone, over five billion dollars in 2024 from Fortnite alone, and Epic is projected make over six billion dollars in 2025 from Fortnite alone.

127.    IngenioShare is entitled to: (i) damages adequate to compensate it for Epic inducing infringement of the '810 Patent, which amounts to, at a minimum, a reasonable royalty; (ii) attorneys' fees; (iii) costs; and (iv) treble damages due to willful infringement.

## COUNT THREE: DIRECT INFRINGEMENT OF INGENIOSHARE'S '038 PATENT

128.    IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

129.    Epic infringed one or more claims of the '038 Patent, including at least claims 46, 58, 59, 60, 61, and 62, in violation of 35 U.S.C. §§ 271(a) by making, using, offering to sell, or selling the patented invention within the United States or importing the patented invention into the United States.

130.    A representative example of Epic's infringing apparatuses, methods, and systems

28

includes (but is not limited to) Epic's video games known as Fortnite and Rocket League. A representative claim chart demonstrating Epic's infringement of the '038 Patent, either literally or under the doctrine of equivalents, is attached as Exhibit D. Epic's Accused Products include, without limitation, other video games providing functionality such as that shown in the representative charts.

131.    IngenioShare notified Epic of its infringement of the '038 Patent prior to filing suit and no later than October 11, 2019

132.    Further notice of IngenioShare's '038 Patent and Epic's infringement thereof was also provided to Epic in the Texas Lawsuit.

133.    IngenioShare has suffered damages as a direct and proximate result of Epic's direct infringement of the '038 Patent.

134.    On information and belief, Epic made over five billion dollars in 2018 from Fortnite alone, over three billion dollars in 2019 from Fortnite alone, over five billion dollars in 2020 from Fortnite alone, over four billion dollars in 2021 from Fortnite alone, over four billion dollars in 2022 from Fortnite alone, over five billion dollars in 2023 from Fortnite alone, over five billion dollars in 2024 from Fortnite alone, and Epic is projected make over six billion dollars in 2025 from Fortnite alone.

135.    IngenioShare is entitled to: (i) damages adequate to compensate it for Epic's direct infringement of the '038 Patent, which amounts to, at a minimum, a reasonable royalty; (ii) attorneys' fees; (iii) costs; and (iv) treble damages due to willful infringement.

## COUNT FOUR: INDIRECT INFRINGEMENT OF INGENIOSHARE'S '038 PATENT

136. IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

137. Epic has known of IngenioShare's '038 Patent since no later than October 11, 2019.

138. IngenioShare notified Epic of its infringement of the '038 Patent no later than October 11, 2019.

139. Further notice of IngenioShare's '038 Patent and Epic's infringement thereof was also provided to Epic in the Texas Lawsuit.

140. Epic has known that its systems infringe one or more claims of IngenioShare's '038 Patent since no later than October 11, 2019.

141. Epic's customers directly infringe at least representative claims 46, 58, 59, 60, 61, and 62 of IngenioShare's '038 Patent by playing and using Epic's video games, including but not necessarily limited to Epic's Accused Products, in a manner that infringes the asserted claims of the patents-in-suit.

142. Epic's customers include people who play video games, including adults, teenagers, and children.

143. In order to download, play, or otherwise access Defendant Epic's *Fortnite*, a user must agree to the *Fortnite* End User License Agreement.

144. Defendant's players must agree to the *Fortnite* End User License Agreement before downloading, playing, or otherwise accessing *Fortnite*.

30

145.    By agreeing to Defendant Epic's *Fortnite* End User License Agreement, that user enters into a valid and enforceable contract with Defendant Epic.

146.    Epic has in the past and continues to indirectly infringe at least representative claims 46, 58, 59, 60, 61, and 62 of IngenioShare's '038 Patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including customers and end users, by encouraging and instructing their customers to use and play Epic's Accused Products in a manner understood and intended to infringe IngenioShare's '038 Patent.  For example, despite knowing of IngenioShare's '038 Patent, and its infringement thereof; as shown above, Epic requires and/or instructs its customers to utilize its video games, such as Fortnite, in a manner understood and intended to infringe IngenioShare's '038 Patent.

147.    Epic indirectly infringed at least claims 46, 58, 59, 60, 61, and 62 of the '038 Patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including retailers, customers and/or end users, by distributing, offering for sale and/or selling Epic's Accused Products in the United States and instructing on their infringing use without authority or license from IngenioShare and in a manner understood and intended to infringe the '038 Patent.

148.    IngenioShare has suffered damages as a direct and proximate result of Epic inducing infringement of IngenioShare's '038 Patent.

149.    On information and belief, Epic made over five billion dollars in 2018 from Fortnite alone, over three billion dollars in 2019 from Fortnite alone, over five billion dollars in 2020 from Fortnite alone, over four billion dollars in 2021 from Fortnite alone, over four billion dollars in 2022 from Fortnite alone, over five billion dollars in 2023 from Fortnite alone, over

31

five billion dollars in 2024 from Fortnite alone, and Epic is projected make over six billion

dollars in 2025 from Fortnite alone.

150.     IngenioShare is entitled to: (i) damages adequate to compensate it for Epic

inducing infringement of the '038 Patent, which amounts to, at a minimum, a reasonable royalty;

(ii) attorneys' fees; (iii) costs; and (iv) treble damages due to willful infringement.

## COUNT FIVE: DIRECT INFRINGEMENT OF INGENIOSHARE'S '727 PATENT

151.     IngenioShare realleges and incorporates herein the preceding allegations of this

Complaint as if fully set forth herein.

152.     Epic infringed one or more claims of the '727 Patent, including at least claims 1,

2, 3, 6, 7, 8, 9, 15, 16, and 17, in violation of 35 U.S.C. §§ 271(a) by making, using, offering to

sell, or selling the patented invention within the United States or importing the patented

invention into the United States.

153.     A representative example of Epic's infringing apparatuses, methods, and systems

includes (but is not limited to) Epic's video games known as Fortnite and Rocket League.  A

representative claim chart demonstrating Epic's infringement of the '727 Patent, either literally

or under the doctrine of equivalents, is attached as Exhibit F.  Epic's infringing products include,

without limitation, other video games providing functionality such as that shown in the

representative charts ("Epic's Accused Products").

154.     IngenioShare notified Epic of its infringement of the '727 Patent prior to filing

suit and no later than on or about June 25, 2021, when the Texas Lawsuit was filed.

155.     IngenioShare has suffered damages as a direct and proximate result of Epic's

direct infringement of the '727 Patent.

156.     On information and belief, Epic made over five billion dollars in 2018 from Fortnite alone, over three billion dollars in 2019 from Fortnite alone, over five billion dollars in 2020 from Fortnite alone, over four billion dollars in 2021 from Fortnite alone, over four billion dollars in 2022 from Fortnite alone, over five billion dollars in 2023 from Fortnite alone, over five billion dollars in 2024 from Fortnite alone, and Epic is projected make over six billion dollars in 2025 from Fortnite alone.

157.     IngenioShare is entitled to: (i) damages adequate to compensate it for Epic's direct infringement of the '727 Patent, which amounts to, at a minimum, a reasonable royalty; (ii) attorneys' fees; (iii) costs; and (iv) treble damages due to willful infringement.

## COUNT SIX: INDIRECT INFRINGEMENT OF INGENIOSHARE'S '727 PATENT

158.     IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

159.     Epic has known of IngenioShare's '727 Patent since no later than on or about June 25, 2021.

160.     IngenioShare notified Epic of its infringement of the '727 Patent no later than June 25, 2021.

161.     Epic has known that its systems infringe one or more claims of IngenioShare's '727 Patent since no later than June 25, 2021.

162.     Epic's customers directly infringe at least representative 1, 2, 3, 6, 7, 8, 9, 15, 16, and 17 of IngenioShare's '727 Patent by playing and using Epic's video games, including but not

necessarily limited to Epic's Accused Products, in a manner that infringes the asserted claims of the patents-in-suit.

163.    Epic's customers include people who play video games, including adults, teenagers, and children.

164.    In order to download, play, or otherwise access Defendant Epic's *Fortnite*, a user must agree to the *Fortnite* End User License Agreement.

165.    Defendant's players must agree to the *Fortnite* End User License Agreement before downloading, playing, or otherwise accessing *Fortnite*.

166.    By agreeing to Defendant Epic's *Fortnite* End User License Agreement, that user enters into a valid and enforceable contract with Defendant Epic.

167.    Epic has in the past and continues to indirectly infringe at least representative 1, 2, 3, 6, 7, 8, 9, 15, 16, and 17 of IngenioShare's '727 Patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including customers and end users, by encouraging and instructing their customers to use and play Epic's Accused Products in a manner understood and intended to infringe IngenioShare's '727 Patent. For example, despite knowing of IngenioShare's '727 Patent, and its infringement thereof; as shown above, Epic requires and/or instructs its customers to utilize its video games, such as Fortnite, in a manner understood and intended to infringe IngenioShare's '727 Patent.

168.    Epic indirectly infringed at least 1, 2, 3, 6, 7, 8, 9, 15, 16, and 17 of the '727 patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including retailers, customers and/or end users, by distributing, offering for sale and/or selling Epic's Accused Products in the United States and

34

instructing on their infringing use without authority or license from IngenioShare and in a manner understood and intended to infringe the '727 Patent.

169.     IngenioShare has suffered damages as a direct and proximate result of Epic inducing infringement of IngenioShare's '727 Patent.

170.     On information and belief, Epic made over five billion dollars in 2018 from Fortnite alone, over three billion dollars in 2019 from Fortnite alone, over five billion dollars in 2020 from Fortnite alone, over four billion dollars in 2021 from Fortnite alone, over four billion dollars in 2022 from Fortnite alone, over five billion dollars in 2023 from Fortnite alone, over five billion dollars in 2024 from Fortnite alone, and Epic is projected make over six billion dollars in 2025 from Fortnite alone.

171.     IngenioShare is entitled to: (i) damages adequate to compensate it for Epic inducing infringement of the '727 Patent, which amounts to, at a minimum, a reasonable royalty; (ii) attorneys' fees; (iii) costs; and (iv) treble damages due to willful infringement.

## PRAYER FOR RELIEF

WHEREFORE, IngenioShare seeks the following relief:

a.     Declaring that Epic has infringed IngenioShare's '810 Patent, IngenioShare's '038 Patent, and IngenioShare's '727 Patent;

b.     That Epic be ordered to pay damages adequate to compensate IngenioShare for its infringement of IngenioShare's '810 Patent, IngenioShare's '038 Patent, and IngenioShare's '727 Patent pursuant to 35 U.S.C. § 284;

c.     That Epic be ordered to pay prejudgment interest pursuant to 35 U.S.C. § 284;

d.     That Epic be ordered to pay all costs associated with this action pursuant to 35

U.S.C. § 284;

e.     That Epic be ordered to pay IngenioShare's attorneys' fees pursuant to 35

U.S.C. § 285; and

f.     That IngenioShare be granted such other and additional relief as the Court

deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), IngenioShare demands a trial by jury of all issues so

triable.

This 2nd day of July, 2025.

Respectfully submitted,

*/s/ Stephen R. Risley*
Stephen R. Risley (Notice of Special Appearance to be filed)
Telephone: 404-855-2101
Email: steverisley@kentrisley.com
GA State Bar No. 606545

Daniel A. Kent (Notice of Special Appearance to be filed)
Telephone: 404-585-4214
Email: dankent@kentrisley.com
GA State Bar No. 415110

KENT & RISLEY LLC
5755 North Point Parkway, Suite 57
Alpharetta, Georgia 30022

36

_/s/ Peter D. Siddoway_

Peter D. Siddoway
SAGE PATENT GROUP
2301 Sugar Bush Road, Suite 200
Raleigh, NC 27612
Telephone: 984-219-3369
Email: psiddoway@sagepat.com
NC Bar No. 45647
Local Civil Rule 83.1(d) Attorney for Plaintiff

Attorneys for Plaintiff,
IngenioShare, LLC